T.C. Memo. 1997-519


UNITED STATES TAX COURT


GUSTAFSON'S DAIRY, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24670-93.                    Filed November 17, 1997.


<u>John S. Ball</u> and <u>Beverly H. Furtick</u>, for petitioner.

<u>Michael A. Pesavento</u> and <u>Benjamin A. DeLuna</u>, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:[1]  Respondent determined the following

deficiencies in and additions to petitioner's Federal income

taxes:

---

[1] This case was previously assigned to Judge Edna G. Parker.
In <u>Gustafson's Dairy, Inc. v. Commissioner</u>, T.C. Memo. 1995-11,
she decided whether to shift the burden of proof to respondent
under sec. 534(a)(2).  Trial was held before Judge Parker.  She
died on Nov. 12, 1996, before deciding the case.  The Chief Judge
reassigned the case to this division of the Court.  We granted
petitioner's motion for a new trial, and a new trial was held.

| FYE Mar. 31[2] | Deficiency | Additions to tax | | |
|---|---|---|---|---|
| | | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6653(a) |
| 1987 | $372,401 | $18,620 | * | -- |
| 1988 | 674,386 | 33,719 | * | -- |
| 1989 | 246,286 | -- | | $12,314 |

* 50 percent of the interest due on the deficiency.

After concessions, we must decide:

(1) Whether petitioner is liable for the accumulated earnings tax imposed by section 531[3] for fiscal years 1987, 1988, and 1989. We hold that it is not.

(2) Whether petitioner is liable for additions to tax for negligence.[4] We hold that it is to the extent discussed below.

Table of Contents

I. Findings of Fact Page

A.    Petitioner and the Gustafson Family . . . . . . . . . . . . . 3
      1.    Petitioner . . . . . . . . . . . . . . . . . . . . . . 3
      2.    The Gustafson Family . . . . . . . . . . . . . . . . . 4
      3.    Officers and Stock Ownership . . . . . . . . . . . . . 4
      4.    Stock Purchase Agreement . . . . . . . . . . . . . . . 5
      5.    Repayment of Debt Owed to Shareholder . . . . . . . . 6
B.    Dairy Operations . . . . . . . . . . . . . . . . . . . . . . 7
      1.    Milk Production and Processing . . . . . . . . . . . . 7

---

[2] Petitioner's 1987, 1988, and 1989 fiscal years ended on March 31.

[3] Unless otherwise indicated, section references are to the Internal Revenue Code. Rule references are to the Tax Court Rules of Practice and Procedure.

[4] For fiscal year 1988, respondent determined that petitioner was liable for the environmental tax under sec. 59A in the amount of $1,177. Petitioner offered no evidence or argument relating to this issue. Respondent contends that it is merely computational. We leave resolution of the amount petitioner owes to the Rule 155 computations.

2.    The Dairy Association . . . . . . . . . . . . . . . . . 8
3.    Petitioner's Sales to Winn-Dixie and Others . . . . . 9
4.    Competition . . . . . . . . . . . . . . . . . . . . . 11
5.    Diseases . . . . . . . . . . . . . . . . . . . . . . 11
6.    Petitioner's Environmental System . . . . . . . . . 13
C.  Petitioner's Finances . . . . . . . . . . . . . . . . . . 14
1.    Petitioner's Capital Expenditures Program . . . . . 14
2.    The Super Trust . . . . . . . . . . . . . . . . . . 19
3.    Petitioner's Expansion Plans . . . . . . . . . . . 21
4.    Insurance . . . . . . . . . . . . . . . . . . . . . 22
5.    Petitioner's Financial Condition . . . . . . . . . 25
6.    Petitioner's _Bardahl_ Calculations . . . . . . . . 28
7.    Petitioner's Business Practices . . . . . . . . . . 29

II. Opinion

A.  Accumulated Earnings Tax . . . . . . . . . . . . . . . . 30
1.    Basic Rules . . . . . . . . . . . . . . . . . . . . 30
2.    Burden of Proof . . . . . . . . . . . . . . . . . . 31
B.  Whether Petitioner Was Formed or Availed of To Avoid
Shareholder Level Taxation . . . . . . . . . . . . . . . 32
1.    Whether Petitioner Intended To Avoid Shareholder
Level Taxes . . . . . . . . . . . . . . . . . . . . 32
2.    Factors Identified in Treasury Regulations . . . . 35
3.    Conclusion . . . . . . . . . . . . . . . . . . . . 37
C.  Reasonable Accumulation for Business Needs . . . . . . . 38
1.    Background . . . . . . . . . . . . . . . . . . . . 38
2.    Herd Expansion and Pollution Control . . . . . . . 40
3.    Capital Improvements . . . . . . . . . . . . . . . 43
4.    Debt Retirement . . . . . . . . . . . . . . . . . . 46
5.    Self-Insurance for Replacement of Herd . . . . . . 48
D.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . 50
E.  Environmental Tax . . . . . . . . . . . . . . . . . . . . 51
F.  Negligence . . . . . . . . . . . . . . . . . . . . . . . 51

## I.   FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

## A.   Petitioner and the Gustafson Family

### 1.   Petitioner

Petitioner is a Florida corporation the principal place of business of which was in Green Cove Springs, Florida, when it filed its petition in this case.  Petitioner produces raw milk

and processes it into dairy products. Petitioner reports its income using the accrual method of accounting. Petitioner's fiscal year ends on March 31.

   2.   The Gustafson Family

Agnes and Frank Gustafson established a dairy in Green Cove Springs, Florida, in 1908. They moved it to the present location in the 1920's, and incorporated petitioner in 1954.

Agnes and Frank Gustafson had six children. Three of their children died before the years in issue: F.N. (Noel) Gustafson, Helen Gustafson Amara, and Julia Gustafson Bagley. G.J. (Pete) Gustafson died in 1995. Two of their children were alive at the time of trial: E.S. Gustafson (age 80) and Ellen Gustafson Townsend (age 82). E.S. (Sherwood) Gustafson, Jr., is the son of E.S. Gustafson.

   3.   Officers and Stock Ownership

Pete and Noel Gustafson worked full time for petitioner. Noel Gustafson was president and manager of petitioner until he died in 1984. E.S. Gustafson became petitioner's president and chief executive officer in 1986 and remained in that position through the years in issue. Sherwood Gustafson was the executive vice president and general manager in the years in issue. E.S. Gustafson and Sherwood Gustafson have worked for petitioner all of their adult lives. E.S. Gustafson ran petitioner and was involved in virtually all aspects of petitioner's business in the years in issue.

From August 29, 1984, to March 31, 1988, the members of petitioner's board of directors were E.S. Gustafson, Pete Gustafson, and Sherwood Gustafson. E.S. Gustafson and Sherwood Gustafson were petitioner's only board members in fiscal year 1989.

Sherwood Gustafson's son, E.S. (Eddie) Gustafson III, works on the farm under the direction of the farm manager. He is a member of the fourth generation of the Gustafson family working for petitioner.

Petitioner's stock is wholly owned by descendants or by spouses of descendants of Agnes and Frank Gustafson, or by trusts of which members of the Gustafson family are the beneficiaries. During the years at issue, there were no discordant shareholders.

### 4. Stock Purchase Agreement

Gustafson family shareholders have kept control of petitioner by restricting the sale or disposition of petitioner's stock to outsiders. Beginning in 1984, petitioner held an option granting it the right to redeem its preferred stock for $1,000 per share if a shareholder transferred his or her stock, including a transfer when a shareholder died. Under the agreement, petitioner had 30 years to pay for the redeemed stock. Petitioner's policy has been to redeem a shareholder's stock under the stock purchase agreement when he or she dies to provide

money for estate taxes and administration under section 303[5] and to keep control of the company in the Gustafson family.

In 1984 and 1985, petitioner paid $1,702,000 to redeem stock held by Noel Gustafson's estate. Petitioner also redeemed Julia Bagley's stock when she died in 1979. During the years in issue, petitioner expected that it would need about $1,700,000 to redeem the stock of Pete Gustafson. However, petitioner did not redeem his stock when he died in 1995 because his estate did not need money to pay estate taxes. Petitioner plans to redeem Ellen Gustafson Townsend's stock when she dies. The redemption price for her 350 shares will be $350,000.

5. Repayment of Debt Owed to Shareholder

During its 1988 fiscal year, petitioner repaid $2,586,750 in debentures it owed to Pete Gustafson's trust and related interest of $735,339 ($3,322,089 total). Petitioner's tax attorney advised petitioner to retire the debentures. Most of the debentures would have become payable in 2014[6] or when Pete Gustafson died, whichever occurred first. Pete Gustafson was 84 years old in 1988 and not in good health.

---

[5] Under sec. 303, a distribution of property to a shareholder to redeem the shareholder's stock to pay death taxes is treated as a distribution in full payment in exchange for the redeemed stock.

[6] One of the debentures would have matured in 2015, one in 2016, and one in 2017.

B.   Dairy Operations

   1.   Milk Production and Processing

Petitioner operates a dairy farm that produces raw milk. During the years in issue, petitioner's dairy herd was one of the largest in the United States at one location.  Petitioner also operates a dairy processing plant that produces finished dairy products and a milk distribution business.  Petitioner's dairy farm and milk processing plant border the southern city limits of Green Cove Springs.  Petitioner's operations have gradually shifted over the years, including the years at issue, from milk producing to milk processing.  Petitioner also owns and manages a beef herd, grows timber, and raises crops.

Petitioner has an open herd rather than a closed herd.  In an open herd, replacement cows are bought from third parties.  In a closed herd, replacements are raised from calves on the farm. Petitioner had in inventory and bought the following number of cows from fiscal year 1983 to fiscal year 1993:

| Fiscal year | Dairy cattle inventory | Dairy cattle purchased |
|---|---|---|
| 1983 | 7,585 | not available |
| 1984 | 6,770 | not available |
| 1985 | 5,920 | 1,458 |
| 1986 | 6,100 | 2,863 |
| 1987 | 6,004 | 2,707 |

| 1988 | 5,849 | 2,473 |
|------|-------|-------|
| 1989 | 5,725 | 2,419 |
| 1990 | 5,262 | 2,634 |
| 1991 | 5,432 | 2,574 |
| 1992 | 5,285 | 2,226 |
| 1993 | 4,691 | 2,195 |

Petitioner reduced the size of its dairy herd from 1983 to 1985 so it could participate in the Milk Diversion Program, which was administered by the U.S. Department of Agriculture.  Dairy and Tobacco Adjustment Act of 1983, Pub. L. 98-180, sec. 102(a) (sec. 201(d)(3)(A) of the Agricultural Act of 1949), 97 Stat. 1128, 1129-1130.  The purpose of the program was to reduce the production of raw milk in the United States.  Id.  Petitioner received $2,052,061.30 ($398,343.50 in fiscal year 1984 and $1,653,717.80 in fiscal year 1985) from the program.  The program ended on March 31, 1985.

2.   The Dairy Association

During the years in issue, petitioner's dairy produced about one-third of the raw milk it needed in its processing plant. During the years in issue, petitioner sold all of the milk it produced to a dairy cooperative, the Florida Dairy Farmers Association (Dairy Association), and bought all of the milk it

processed and sold from the Dairy Association.  Petitioner joined the Dairy Association so it would have enough milk to process.

Petitioner bought more than $19,000,000 of raw milk to process in each of the years in issue.  Petitioner's payments to the Dairy Association were 55 to 59 percent of petitioner's cost of goods sold for the years at issue.

3.   Petitioner's Sales to Winn-Dixie and Others

Petitioner sells milk products under its own label. Petitioner distributes its products to about 2500 retail outlets. Petitioner maintains a fleet of more than 200 trucks to distribute its products.

About 80 percent of petitioner's sales of processed milk in the years in issue were to six customers:  Winn-Dixie Stores, Inc. (Winn-Dixie), Publix, Lil' Champ, Pic-N-Sav, Walgreens, and Miller Enterprises.

Petitioner's biggest customer was Winn-Dixie.  Winn-Dixie has purchased milk products from petitioner for almost 50 years. Almost half of petitioner's sales during the years in issue were to Winn-Dixie.

Petitioner processes, packages, and distributes some of the "Superbrand" products, the private label milk for Winn-Dixie.

Petitioner provided Superbrand milk for Winn-Dixie's stores in Winn-Dixie's Jacksonville District.  Petitioner also processes and sells milk to Winn-Dixie under the Gustafson's Dairy label.

Petitioner must pass inspections conducted by Winn-Dixie to retain its Winn-Dixie Superbrand account.  Petitioner has complied with modifications requested by Winn-Dixie during its periodic inspections of petitioner's plant.

Petitioner has never had a written contract with Winn-Dixie. Winn-Dixie could end its relationship with petitioner without notice, but had not done so by the years in issue.

About 10-20 years before trial, Winn-Dixie began to produce Superbrand milk in its own production facilities.  Winn-Dixie now processes and packages Superbrand milk for all of its stores in Florida except those in the Jacksonville District.  Petitioner is the sole remaining outside supplier of Winn-Dixie's Superbrand milk.

Winn-Dixie was founded by four brothers named Davis and is headquartered in Jacksonville, Florida.  The Davis family owned a controlling interest in Winn-Dixie during the years at issue. The children of Agnes and Frank Gustafson had a close social relationship with the Davis brothers over the years, including the years at issue.

4.   Competition

Petitioner's major competitors in the years in issue were Dean Foods, Borden's (the largest milk processor in the country during the 1980's), Sealtest, and Flav-O-Rich.  These are large, publicly held corporations.

The number of milk processors in northern Florida has steadily declined in the last 20 to 25 years.  Many of the processors which were similar in size to petitioner had gone out of business or sold out to larger companies before or during the years in issue.

5.   Diseases

Petitioner frequently reviewed the risk of exposure of its cattle to diseases and contaminated feed with its veterinarian. Although the threat to petitioner's cattle from individual diseases has changed over the years, the overall risk posed by disease has increased as its cattle have become more concentrated in smaller areas.  Some diseases have been cured, but the risk from others such as bovine virus diarrhea, bovine leukemia virus, and fescue foot has increased.  The fact that petitioner has an open herd increases the herd's risk of disease because diseased cows may be brought into the herd.

Petitioner's dairy herd is at risk of suffering from diseases such as brucellosis, tuberculosis, and mastitis. The herd is also at risk of being exposed to contaminants such as aflatoxin (contamination of feed). Petitioner has never lost cattle because of tuberculosis or aflatoxins. Cows brought to Florida are tested for brucellosis and tuberculosis. Brucellosis is a contagious disease. Cows with brucellosis must be slaughtered. About 1,300 of petitioner's 9,000 cows died of brucellosis from March 5, 1974, to April 21, 1976, and about 200 of petitioner's other cows were afflicted by brucellosis.

Petitioner received a slaughter price for each cow it culled from its herd during the brucellosis outbreak in the mid-1970's. During the years in issue, the slaughter price was about $400 per cow, and the replacement cost was $950 to $1,050. Petitioner could also receive indemnities of $25 from Florida and an amount unspecified in the record from the Federal government for each cow slaughtered due to brucellosis.

Petitioner's herd was vaccinated for brucellosis from 1975 to 1993, and was quarantined by the State of Florida from the mid-1970's to October 1988. Although petitioner's herd was brucellosis-free in 1988, about 120 of its cows tested positive for brucellosis from 1985 to 1989.

Petitioner would receive no indemnity if it destroyed animals because they had tuberculosis or certain other diseases.

6.  Petitioner's Environmental System

In October 1988, a dike forming a part of petitioner's animal waste control system failed, causing effluent to be discharged over a 10-acre area.

Petitioner knew by the end of March 1989 that it had significant environmental problems but did not fully appreciate how severe those problems were.  The chief engineer of the Soil Conservation Service (SCS) of the U.S. Department of Agriculture evaluated petitioner's property and made recommendations for designing petitioner's environmental system.  He told Sherwood Gustafson during the design process from October 1988 to June 1990 that petitioner would have to reduce the size of the herd because petitioner's land could not accommodate an animal waste control system for all of its existing herd.

Petitioner applied for a permit to build a new animal waste control system (the environmental system) in 1990.  The SCS designed petitioner's new environmental system.  The Florida Department of Environmental Regulation (DER) approved the plans in June 1990.  The new system required petitioner to keep its herd in a small high-intensity area (HIA) and to build a 90-acre

holding lagoon.  The environmental system could accommodate 5,500 cows.  SCS designed the environmental system to accommodate as many cows as possible.

Petitioner applied for a construction permit around December 21, 1990.  The Florida DER issued the permit on April 18, 1991. Due to delays in construction, the permit was extended to November 4, 1994, and then to April 18, 1996.

Petitioner spent $21,616 for pollution control in fiscal year 1989, and $139,868 in fiscal year 1990.  Petitioner spent $5,210,970 on the environmental system from April 1, 1988, to March 31, 1995.

C.   Petitioner's Finances

1.   Petitioner's Capital Expenditures Program

In March 1985, petitioner's board of directors told its controller to prepare detailed 5-year capital expenditure projections for its annual meetings.  Petitioner's board of directors made this request after petitioner had received $2,052,061.30 from the Milk Diversion Program.  John Fisher, petitioner's controller for the years in issue, prepared the capital expenditures program (CEP) report with the help of E.S. Gustafson, Sherwood Gustafson, and petitioner's attorney, James Sheehan.

Petitioner's controller's March 1986 CEP report stated that: (a) Petitioner must expand its herd and milking facilities to meet the demand of the milk cooperative because Government programs will reduce the number of cows in Florida; and (b) due to the exorbitant increase in liability insurance costs, petitioner will reduce insurance from $10,000,000 to $5,000,000 and self-insure for the remaining $5,000,000.

Petitioner's board analyzed its business needs in detail in each of the years in issue and concluded that it needed much more money than it had. The CEP listed three categories of expenditures. Category one was capital expenditures, self-insurance reserves, and petitioner's working capital needs for the next fiscal year. Category two listed probable needs for the 2 years after the next fiscal year. Category three projected probable needs for the 2 years after that. Petitioner intended to implement the plans recorded in all three categories, but category one was more definite than category two and category two was more definite than category three.

The CEP did not count amounts transferred to the Super Trust, discussed below at paragraph I-C-2, as funds available to meet petitioner's projected expenses.

Petitioner projected in the CEP for fiscal years 1986-89 that it would spend or accumulate the following amounts (in thousands of dollars):

|  | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|
| Category one: |  |  |  |  |
| Equip./constr. | $1,960 | $560 | $1,155 | $400 |
| Pollution | 60 | -- | 50 | 500 |
| Land | -- | -- | 50 | 1,500 |
| Working capital | 3,000 | 3,000 | 3,200 | 3,600 |
| Self-ins. (liab.) | 5,000 | 5,000 | 5,000 | 5,000 |
| Self-ins. (herd) | -- | 3,300 | 3,900 | 3,900 |
|    Total | $10,020 | $11,860 | $13,355 | $14,900 |
| Category two: |  |  |  |  |
| Equip./constr. | $1,565 | $1,650 | $950 | $3,500 |
| Pollution | -- | 50 | 500 | 500 |
| Land[1] | 200 | 200 | 1,500 | 2,000 |
| Herd expansion | 1,425 | 1,425 | 1,575 | 1,575 |
| Self-ins. (herd)[2] | -- | -- | 975 | 975 |
|    Total | $3,190 | $3,325 | $5,500 | $8,550 |
| Category three: |  |  |  |  |
| Equip./constr.[3] | $1,115 | $1,115 | $1,835[4] | $1,195 |
| Land | -- | -- | 2,000 | -- |
| Herd expansion | 1,425 | 1,425 | 1,575 | 1,575 |
| Self-ins. (herd)[2] | -- | 825 | 3,900[5] | 975 |
|    Total | $2,540 | $3,365 | $9,310 | $3,745 |
| Grand total | $15,750 | $18,550 | $28,165 | $27,195 |

-----

[1] In the projections for category two for 1988 and category one for 1989, the $1,500,000 amount for land assumed petitioner would buy 3,000 acres at $500 per acre. In the 1989 category two projection, the $2,000,000 amount for land assumed petitioner would buy 800 acres at $2,500 per acre.

[2] These amounts were based on the assumption that petitioner would expand its herd by 1,500 cows.

[3] These amounts were to provide new facilities needed for a larger herd.

[4] This amount included $500,000 for pollution control.

[5] Petitioner concedes that the amount for self-insurance for the expanded part of the herd should have been $975,000, not $3,900,000.

Petitioner's projected and actual expenses compared as

follows:

CATEGORY ONE

| Year | Projected expenses | Actual expenses in following year |
|---|---|---|
| 3/31/87 | | |
| Equip./constr. | $560,000 | $865,043 |
| Pollution | 0 | 0 |
| Land | 0 | 0 |
| | | |
| 3/31/88 | | |
| Equip./constr. | 1,155,000 | 1,157,335 |
| Pollution | 50,000 | 21,616 |
| Land | 50,000 | 0 |
| | | |
| 3/31/89 | | |
| Equip./constr. | 400,000 | 847,859 |
| Pollution | 500,000 | 139,868 |
| Land | 1,500,000 | 0 |
| Total | $4,215,000 | $3,031,721 |

CATEGORY TWO

| Year | Projected expenses | Actual expenses in second and third years |
|---|---|---|
| 3/31/87 | | |
| Equip./constr. | $1,650,000 | $2,005,194 |
| Pollution | 50,000 | 161,484 |
| Land | 200,000 | 0 |
| Herd expansion | 1,425,000 | 0 |
| | | |
| 3/31/88 | | |
| Equip./constr. | 950,000 | 1,758,299 |
| Pollution | 500,000 | 1,241,695 |
| Land | 1,500,000 | 2,249,625 |
| Herd expansion | 1,575,000 | 0 |
| | | |
| 3/31/89 | | |
| Equip./constr. | 3,500,000 | 1,672,171 |
| Pollution | 500,000 | 1,487,947 |
| Land | 2,000,000 | 2,249,625 |
| Herd expansion | 1,575,000 | 0 |
| Total | $15,425,000 | $12,826,040 |

2. <u>The Super Trust</u>

    a. <u>Formation and Purpose</u>

On March 31, 1988, E.S. Gustafson formed Gustafson's Dairy Farm Super Trust (the Super Trust) to induce petitioner's shareholders to make some of their personal assets available to petitioner to help meet petitioner's long-term financial needs (i.e., 5 to 20 years in the future) and to hold petitioner's voting stock. E.S. Gustafson was the grantor and individual trustee. The Florida National Bank (later First Union National Bank of Florida) was the corporate trustee. Petitioner's board authorized the creation of the Super Trust. Tax considerations were not a factor when petitioner established the Super Trust.

The Super Trust agreement charged the trustee of the Super Trust with determining the highest and best use of petitioner's 8,000 acres and other land to be acquired by petitioner, deciding the size of the dairy herd and whether to split the dairy herd into smaller herds, and making decisions concerning the distribution of petitioner's products. The Super Trust did not manage petitioner and was not concerned with meeting petitioner's short-term (5 years or less) needs.

b.    Funding of the Super Trust

Petitioner and members of the Gustafson family contributed liquid assets and stock in petitioner to the Super Trust.  These assets were held in separate funds for each contributor.

Petitioner transferred $3,677,911 to the Super Trust in fiscal year 1988 and $1,250,000 in fiscal year 1989.  Petitioner accounted for these transfers on its books by reducing cash and retained earnings by the amounts of the transfers.  Petitioner reported these transfers as nondeductible contributions from retained earnings on its Federal income tax returns.  Petitioner received the net income from its fund but was not entitled to have its principal returned until the Super Trust was terminated. E.S. Gustafson had sole discretion to invade the principal of petitioner's fund in the Super Trust and to direct how to use it.

c.    Trust Income

The Super Trust filed Forms 1041, U.S. Fiduciary Income Tax Return, for 1988 and 1989.  It reported no taxable income for those years.  Most of its income was from tax-exempt municipal bonds.  Petitioner failed to report $35,285.08 of taxable income and $152,637.74 of tax-exempt municipal bond interest earned by

the Super Trust in fiscal year 1989.  Petitioner concedes that it should have reported this income for 1989.  Petitioner's failure to report the income did not result in an income tax deficiency because petitioner's income was more than offset by fuel excise tax credits in 1989.

### 3.   Petitioner's Expansion Plans

In 1988, petitioner decided to develop a comprehensive land use plan for the 8,000 acres adjoining its dairy.  Petitioner believed that the area around the dairy would be developed and that petitioner would move.

Petitioner projected in category two of its CEP for fiscal year 1988 and in category one of its CEP for fiscal year 1989 that it needed to spend $1,500,000 on land.  Petitioner negotiated to buy property from the Roberts family (the Roberts property) in 1989.  However, petitioner did not buy the Roberts property.

During the years in issue, petitioner's board learned that Union Camp Corp. planned to develop 56,000 acres of land that it owned adjacent to and south of petitioner's property.  The Union

Camp project was named "The Villages of Seminole Forest".  Union Camp announced the project on July 26, 1990.

Around December 31, 1990, petitioner bought 1,799.7 acres of land from Union Camp (the Union Camp property) for $2,249,625 in cash, of which $1,200,000 came from petitioner's fund in the Super Trust.  The Union Camp property adjoined petitioner's land and increased petitioner's land holdings to about 9,500 acres.

In 1993, Union Camp announced that it would not develop The Villages of Seminole Forest, and petitioner dropped its plans to develop its property contiguous to the Union Camp property.

4.   Insurance

a.   Herd Insurance

Petitioner carried no commercial insurance on its herd in the years in issue.  Most dairy farmers do not commercially insure their herds because it is too expensive.

Petitioner estimated how much it needed for a reserve by subtracting the expected salvage price from the replacement cost for its herd of 6,000 cows.  Petitioner assumed that its replacement cost would be $950 per cow in 1987, and $1,050 in 1988 and 1989.  Petitioner increased the self-insurance reserve

for fiscal years 1988 and 1989 because the cost of cows increased. Petitioner estimated that it would receive a slaughter price of $400 for each cow. Thus, petitioner's board had a reserve of $3,300,000 in fiscal year 1987 (6,000 cows x $550), and $3,900,000 in fiscal years 1988 and 1989 (6,000 cows x $650) to cover losses to the dairy herd in the event of disease or other disaster.

### b. Liability Insurance

Petitioner bought commercial liability insurance and funded a reserve for self-insurance for risks above $5,000,000 in the years in issue.

During the years in issue, petitioner was covered by Insurance Company of North America (INA) primary liability insurance policies.[7] Petitioner had the following commercial liability insurance policies:

---

[7] Some of petitioner's insurance policies provided per occurrence coverage and others provided aggregate coverage. A per occurrence policy pays up to the amount of the policy for each covered loss. An aggregate policy pays no more than the amount of the policy during the policy period regardless of the number of claims.

| Category | Policy amounts | Annual premium |
|---|---|---|
| Business auto | $500,000 per occurrence | $130,000-140,000 |
| Comprehensive general liability | 1,000,000 per occurrence | 45,000-75,000 |
| Products liability | 1,000,000 per occurrence and aggregate | [1] |

[1] The premium for comprehensive general liability insurance includes the premium for products liability insurance.

Petitioner had insurance on its farm buildings and farm personal property.

Petitioner also had umbrella policies[8] in the years in issue. From 1983 to 1985, petitioner carried $10,000,000 of umbrella coverage. In July 1985, U.S. Fire Insurance Co. (U.S. Fire) decided not to offer umbrella policies with coverage exceeding $5,000,000. U.S. Fire's decision remained in effect for 12 to 18 months. In July 1986, U.S. Fire notified petitioner that it would not renew petitioner's $5,000,000 umbrella policy at the end of the policy period on October 1, 1986. As a result,

---

[8] An umbrella insurance policy is a supplemental liability policy that protects against losses above the amount covered by other liability insurance policies.

petitioner reduced its umbrella coverage from $10,000,000 to $5,000,000 and self-insured for risks above $5,000,000. Petitioner had an umbrella policy providing per occurrence and aggregate coverage of $5,000,000. The annual premium for this policy was $57,000 to $67,000. Benefits under this policy were payable only if petitioner had exhausted the primary policies. Petitioner had the following umbrella insurance coverage from 1983 to 1989:

| Policy period | Insurer | Limits | Annualized premium |
|---|---|---|---|
| 11/11/83-1/1/85 | Western Employers | $10 mil. per occur. and aggregate | $6,517 |
| 1/1/85-10/1/85 | U.S. Fire | $10 mil. per occur. | 12,467 |
| 10/1/85-10/1/86 | U.S. Fire | $5 mil. per occur. | 23,500 |
| 1/1/86-1/1/87[9] | INA | $5 mil. aggregate | 57,096 |
| 1/1/87-1/1/88 | INA | $5 mil. aggregate | 66,707 |
| 1/1/88-1/1/89 | INA | $5 mil. aggregate | 57,130 |
| 1/1/89-1/1/90 | INA | $5 mil. aggregate | 46,245 |

5.   Petitioner's Financial Condition

Petitioner paid no dividends in fiscal year 1982, but it paid dividends annually from 1983 through the years in issue. Petitioner paid almost $900,000 in dividends to its stockholders from March 31, 1983, to March 31, 1989, an average of about 10

---

[9] During the first 6 months of the 1987 fiscal year (from Mar. 31 to Oct. 1, 1986), petitioner carried $10,000,000 of commercial umbrella liability insurance.

percent of its net after-tax income.  During the years at issue, petitioner's net income after taxes was $1,095,848 for fiscal year 1987, $1,877,983 for fiscal year 1988, and $1,058,277 for fiscal year 1989.  Petitioner paid dividends of $100,000, averaging about 7.44 percent of net after-tax income, in each of those years.

Petitioner's book income, taxes paid, book net income after taxes, dividends paid, and percentage of net income paid as dividends for fiscal years 1982 to 1989 were as follows:

| INCOME, TAXES PAID, AND DIVIDENDS | | | | | |
|---|---|---|---|---|---|
| Tax year ending | Book net income | Federal taxes | Book net income after taxes | Dividends paid | Percentage of net income paid as dividends |
| 3/31/82 | $1,483,898 | $586,418 | $897,480 | 0 | 0.0 |
| 3/31/83 | 2,244,000 | 725,508 | 1,518,492 | $299,421 | 19.7% |
| 3/31/84 | 642,513 | 85,440 | 557,073 | 100,057 | 18.0 |
| 3/31/85 | 3,002,591 | 1,245,977 | 1,756,614 | 99,966 | 5.7 |
| 3/31/86 | 1,738,731 | 693,338 | 1,045,393 | 100,000 | 9.6 |
| 3/31/87 | 2,029,349 | 933,501 | 1,095,848 | 100,000 | 9.1 |
| 3/31/88 | 2,980,721 | 1,102,738 | 1,877,983 | 100,000 | 5.3 |
| 3/31/89 | 1,511,400 | 453,123 | 1,058,277 | 100,000 | 9.4 |
| Total | $15,633,203 | $5,826,043 | $9,807,160 | $899,444 | 9.2% |

Petitioner's annual sales increased from $26,254,806 in fiscal year 1982 to $42,493,252 in fiscal year 1987, $43,627,256 in fiscal year 1988, and $42,978,226 in fiscal year 1989.

Petitioner paid salaries to its officers from fiscal year 1982 to fiscal year 1989 as follows:

| Fiscal year | E.S. Gustafson | G.J. Gustafson | Sherwood Gustafson |
|---|---|---|---|
| 1982 | $275,000 | $140,000 | $60,000 |
| 1983 | 275,000 | 140,000 | 60,000 |
| 1984 | 275,000 | 140,000 | 60,000 |
| 1985 | 400,000 | 140,000 | 135,000 |
| 1986 | 450,000 | 145,000 | 265,000 |
| 1987 | 450,000 | 140,000 | 270,000 |
| 1988 | 450,000 | 140,000 | 305,000 |
| 1989 | 400,000 | 140,000 | 325,000 |

Petitioner's net available current assets (i.e., current assets plus liquid assets held in petitioner's fund in the Super Trust[10] less current liabilities) were as follows:

| Fiscal year | Current assets | Current liabilities | Net liquid assets |
|---|---|---|---|
| 1982 | $7,358,893 | $2,380,061 | $4,978,832 |
| 1983 | 7,665,571 | 3,081,937 | 4,583,634 |
| 1984 | 6,892,987 | 2,129,431 | 4,763,556 |
| 1985 | 11,272,122 | 4,139,044 | 7,133,078 |
| 1986 | 11,089,919 | 2,857,557 | 8,232,362 |
| 1987 | 12,049,090 | 2,759,589 | 9,289,501 |
| 1988 | 12,916,884 | 2,775,775 | 10,141,109 |

---

[10] Petitioner concedes that amounts it held in the Super Trust are liquid assets available to it for purposes of this case.

| 1989 | 13,956,580 | 3,120,759 | 10,835,821 |
|------|------------|-----------|------------|

Petitioner's current asset to current liability ratios were 4.36 for fiscal year 1987, 4.65 for fiscal year 1988, and 4.47 for fiscal year 1989.

Petitioner's retained earnings increased from $8,810,568 to $16,796,904 from March 31, 1982, to March 31, 1989, as follows:

| RETAINED EARNINGS AND SUPER TRUST FUNDS | | | | | |
|------|------|------|------|------|------|
| Year | Book beginning retained earnings | Additions | Deductions | (1) Book ending retained earnings | (2) Super Trust funds | (3) Total of (1) and (2) |
| 1982 | $7,913,088 | $897,480 | 0 | $8,810,568 | 0 | N/A |
| 1983 | 8,810,568 | 1,736,844 | $299,421 | 10,247,991 | 0 | N/A |
| 1984 | 10,247,991 | 557,073 | 100,057 | 10,705,007 | 0 | N/A |
| 1985 | 10,705,007 | 1,756,614 | 99,966 | 12,361,655 | 0 | N/A |
| 1986 | 12,361,655 | 1,045,393 | 200,056 | 13,206,992 | 0 | N/A |
| 1987 | 13,206,992 | 1,095,848 | 756,733 | 13,546,107 | 0 | N/A |
| 1988 | 13,546,107 | 2,596,370 | 3,777,914 | 12,364,563 | $3,677,911 | $16,042,474 |
| 1989 | 12,364,563 | 887,555 | 1,609,867 | 11,642,251 | 5,154,653 | 16,796,904 |

6.    Petitioner's Bardahl Calculations

Petitioner estimated its working capital needs in the capital reports at each of the year-end meetings.  Petitioner did not use the Bardahl[11] formula to calculate its working capital

---

[11] Bardahl Manufacturing Corp. v. Commissioner, T.C. Memo. 1965-200.

needs for fiscal year 1987.  The minutes for petitioner's March 31, 1988, board meeting included a <u>Bardahl</u> calculation for the first time.  The minutes of the March 31, 1989, meeting also included a <u>Bardahl</u> calculation.  Petitioner based its <u>Bardahl</u> calculations on its prior year's expenses because petitioner had not closed its books by the time of the year-end meetings and operating expenses for the current year were not available.

Based on its operating expenses for the year ending March 31, 1987, petitioner concluded that it needed $3,200,000 for working capital for fiscal year 1988.  For fiscal year 1989, petitioner concluded that it needed $3,600,000 for working capital.

### 7.  Petitioner's Business Practices

E.S. Gustafson regularly gave about $30,000 of his own money as Christmas gifts to petitioner's employees.  Neither he nor petitioner deducted these gifts.  E.S. Gustafson made Christmas gifts to the employees for about 15 years, including the years in issue.

Petitioner did not lend money to or own stock in its suppliers during the years at issue.  Petitioner's officers and directors do not serve as officers or directors of any of its suppliers.

Petitioner did not lend money to its shareholders or invest in unrelated businesses or ventures during the years in issue.  Petitioner does not own any airplanes, yachts, condominiums, or

similar facilities, and does not insure the lives of its shareholders.

## II. OPINION

### A. Accumulated Earnings Tax

#### 1. Basic Rules

A corporation is subject to the accumulated earnings tax if it is formed or availed of to avoid income taxation of its shareholders by accumulating earnings and profits. Sec. 532(a). The most important factor in deciding if the accumulated earnings tax applies is whether a corporation accumulates earnings and profits beyond the reasonable needs of the business. United States v. Donruss Co., 393 U.S. 297, 307 (1969); Technalysis Corp. v. Commissioner, 101 T.C. 397, 403 (1993). A corporation that accumulates earnings and profits beyond its reasonable business needs is presumed to do so to avoid income tax of its shareholders. Sec. 533(a). A taxpayer can rebut the presumption with a preponderance of evidence to the contrary. Sec. 533(a). The accumulated earnings tax does not apply if a corporation has unreasonably accumulated earnings but lacks the proscribed purpose. Technalysis Corp. v. Commissioner, supra at 403; Pelton Steel Casting Co. v. Commissioner, 28 T.C. 153, 173 (1957), affd. 251 F.2d 278 (7th Cir. 1958).

The accumulated earnings tax is a penalty and is strictly construed. Ivan Allen Co. v. United States, 422 U.S. 617, 626 (1975); Pelton Steel Casting Co. v. Commissioner, supra at 172-

173.  Whether a corporation was formed or availed of to avoid tax or has permitted its earnings and profits to accumulate beyond its reasonable needs are questions of fact.  United States v. Donruss Co., supra at 307; Helvering v. National Grocery Co., 304 U.S. 282 (1938); Bremerton Sun Publ'g Co. v. Commissioner, 44 T.C. 566, 582 (1965).

2.  Burden of Proof

Before respondent issued the notice of deficiency in this case, respondent notified petitioner that respondent proposed to issue a notice of deficiency for fiscal years 1987, 1988, and 1989 including a determination that petitioner is liable for accumulated earnings tax under section 531.  Petitioner submitted a timely statement under section 534(c) stating the grounds on which it relied to establish that it had not accumulated earnings beyond the reasonable needs of its business.  In this statement, petitioner alleged that it had the following grounds for accumulating earnings:  (a) Working capital needs, (b) self-insurance (general and product liability), (c) replacement of its herd, (d) replenish/increase herd and animal waste control system, (e) capital improvements, (f) dependence on Winn-Dixie and fears of competition, and (g) herd relocation and land development.  In its petition, petitioner asserted that it had two additional grounds for accumulation:  stock redemption and retirement of debt.

In <u>Gustafson's Dairy, Inc. v. Commissioner</u>, T.C. Memo. 1995-11, we held that the burden of proof is on respondent for ground (d) for 1987 and 1988, and for the first $550,000 for 1989, and for ground (e) to the extent of petitioner's purchase of the Union Camp property for $2,249,625. The burden of proof is on petitioner as to whether it permitted its earnings and profits to accumulate beyond the reasonable needs of its business for all other grounds, and whether it was formed or availed of to avoid shareholder level taxation. <u>Gustafson's Dairy, Inc. v. Commissioner</u>, <u>supra</u>.

B. <u>Whether Petitioner Was Formed or Availed of To Avoid Shareholder Level Taxation</u>

    1. <u>Whether Petitioner Intended To Avoid Shareholder Level Taxes</u>

E.S. Gustafson and Sherwood Gustafson thought that petitioner would have difficulty surviving in competition with large corporate milk producers. They knew that many dairy farmers in northern Florida had gone out of business before or during the years at issue. They were concerned that petitioner might lose the Winn-Dixie account. They wanted petitioner to be able to redeem the stock of Pete Gustafson when he died. They wanted petitioner to be free of debt.

By the time of the years at issue, Sherwood Gustafson had worked for petitioner for 25-27 years, his entire adult life. He felt responsible for the continued survival of the business. His lifelong commitment to running the dairy gave him a strong sense

of obligation that petitioner survive in a highly competitive business. Avoidance of tax at the shareholder level played no part in the financial management of petitioner by E.S. Gustafson and Sherwood Gustafson.

Respondent contends that petitioner was formed or availed of to avoid shareholder level taxation. Respondent argues that petitioner's detailed plans are an attempt to avoid the accumulated earnings tax. Respondent argues that the fact that E.S. Gustafson and Sherwood Gustafson knew about the accumulated earnings tax during the years in issue, that petitioner attached Bardahl computations to its minute sheets, and that petitioner used language in its CEP and minutes like that used in the accumulated earnings tax statutes shows that petitioner acted merely to avoid the accumulated earnings tax. We disagree. Petitioner properly had and contemporaneously recorded its specific and definite plans.

Respondent argues that we should disregard petitioner's grounds for accumulating funds that were not listed in the CEP[12] and argues that petitioner's failure to include certain grounds in the CEP shows that those grounds were not bona fide. We disagree. Petitioner reasonably recognized the potential harm to its business if it lost the Winn-Dixie account; the fact that it

[12] Petitioner did not list the following grounds for accumulation in its CEP: (a) Dependence on Winn-Dixie/competition, (b) herd relocation and land development, (c) stock redemption, and (d) debt retirement.

could not quantify the amount it needed for this potential problem does not make it any less of a concern.

Respondent contends that petitioner formed the Super Trust solely to conceal income and avoid the accumulated earnings tax. Respondent argues that petitioner incorrectly accounted for its contributions to the Super Trust and that petitioner should have reported income from the Super Trust during the years in issue.

We disagree that petitioner created the Super Trust to avoid the accumulated earnings tax. Also, the Super Trust properly filed Forms 1041 for 1988 and 1989, and petitioner reported its transfers to the Super Trust on Schedule M-2 of its 1988 and 1989 returns. The Super Trust served many legitimate purposes; for example, it helped to induce the shareholders to pledge their funds for the long-term benefit of the company. Respondent admitted in the answer to petitioner's amended petition[13] that the Super Trust funds were pledged for the reasonable business needs of petitioner.

Respondent contends that, in estimating its reasonable business needs, petitioner's CEP erroneously failed to consider petitioner's projected future revenues. We disagree. Respondent cites Dixie, Inc. v. Commissioner, 277 F.2d 526, 528 (2d Cir.

---

[13] Petitioner amended paragraph 5(s) of its petition as follows:

5(s). The funds in the Super Trust are held for the reasonable business needs of the Petitioner.

1960), affg. 31 T.C. 415 (1958), for the proposition that the taxpayer must assume that it will continue to be profitable in analyzing its business needs at the end of each year, or to count future revenues as a source for financing those needs. Respondent's reliance on Dixie, Inc. v. Commissioner, supra, is misplaced. The U.S. Court of Appeals for the Second Circuit noted in passing that the taxpayer had not considered future earnings as one of several factors showing that the taxpayer did not formulate a specific and definite plan for which accumulating earnings would have been reasonable. Id.

2. Factors Identified in Treasury Regulations

Treasury regulations list the following as examples of factors to consider in determining whether a corporation was formed or availed of to avoid income tax of its shareholders: (a) Dealings between the corporation and its shareholders for the personal benefit of the shareholders, such as personal loans; (b) corporate investment of undistributed assets in unrelated businesses or investments; and (c) the corporation's dividend history. Sec. 1.533-1(a)(2), Income Tax Regs. We next consider how those factors apply here.

a.   Dealings Between Petitioner and Its Shareholders

Petitioner did not lend money to, or spend funds to personally benefit, its shareholders.

b.   Investment in Unrelated Businesses

Petitioner did not invest in unrelated businesses.

c.   Petitioner's Dividend History

Petitioner paid dividends which averaged about 10 percent of its after-tax income from 1983 through the years in issue. Dividends averaged about 7.5 percent for the 3 years in issue.

Petitioner paid substantial salaries to its officers from 1983 to 1989. This generally shows that the taxpayer did not intend to avoid shareholder level taxes. Technalysis Corp. v. Commissioner, 101 T.C. at 410-411; Bremerton Sun Publ'g Co. v. Commissioner, 44 T.C. at 588; John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 473 (1965).

Respondent points out that petitioner's controller and Sherwood Gustafson did not know how E.S. Gustafson decided the amount of dividends to pay, and argues that petitioner's dividend history was poor in view of its increasing liquidity. Respondent contends that petitioner's dividends were not sufficient. We disagree; level dividends may be sufficient. Bremerton Sun Publ'g Co. v. Commissioner, supra; John P. Scripps Newspapers v. Commissioner, supra at 473 (the taxpayer paid the same amount of dividends for 9 years). Respondent relies on Doug-Long, Inc. v. Commissioner, 72 T.C. 158 (1979). In that case, the taxpayer

paid minimal dividends before the first year in issue.  The taxpayer's president and sole shareholder reduced his salary so that the total amount he received from the taxpayer (dividends plus salary) was virtually unchanged for 4 years.  Id. at 182. Unlike Doug-Long, Inc., petitioner paid a reasonable amount of dividends from 1983 to 1989, the salaries paid to petitioner's officers steadily increased before the years in issue, and petitioner did not reduce dividends to keep payments to its shareholders level.

Although petitioner could have paid larger dividends, it reasonably chose to use those funds to expand its business.  Its business did grow as shown by the substantial increase in its annual sales from 1982 to 1989.  We think petitioner prudently decided to pay reasonable dividends and salaries to its officer-shareholders, and retained the rest of its earnings to expand the business.  See John P. Scripps Newspapers v. Commissioner, supra at 473 (taxpayer acted prudently in distributing a substantial part of its earnings and retaining the remainder to use to expand its operations).

3.  Conclusion

We conclude that petitioner was not formed or availed of to avoid income tax on its shareholders.

C.    Reasonable Accumulation for Business Needs

   1.    Background

A business may accumulate earnings to meet its reasonably anticipated needs.  Sec. 537(a); sec. 1.537-1(a)(1), Income Tax Regs.  The corporation must have specific, definite, and feasible plans to use the accumulation.  Sec. 1.537-1(b)(1), Income Tax Regs.[14]  We consider the judgment of corporate management in deciding if its accumulation of earnings was reasonable.  Raymond I. Smith, Inc. v. Commissioner, 292 F.2d 470, 475-476 (9th Cir. 1961), affg. 33 T.C. 141 (1959); Technalysis Corp. v. Commissioner, supra at 411.

A corporation's reasonably anticipated needs are considered based on the facts at the end of the taxable year.  Sec. 1.537-1(b)(2), Income Tax Regs.[15]  Treasury regulations state that

---

[14] Sec. 1.537-2(b), Income Tax Regs., lists several nonexclusive examples of reasonable grounds for accumulating earnings and profits:  (1) To provide for bona fide expansion of business or replacement of plant; (2) To acquire a business enterprise through purchasing stock or assets; (3) To provide for the retirement of bona fide indebtedness created in connection with the trade or business * * *; (4) To provide necessary working capital for the business, such as, for the procurement of inventories; (5) To provide for investments or loans to suppliers or customers if necessary in order to maintain the business of the corporation; or (6) To provide for the payment of reasonably anticipated product liability losses * * *.

[15] Sec. 1.537-1(b)(2), Income Tax Regs., provides:

(continued...)

subsequent events may not be considered to show that an accumulation was unreasonable if the taxpayer reasonably anticipated the need at the end of the taxable year, but may be considered to determine whether the corporation consummated or intended to consummate the plan for which the earnings and profits were accumulated. Id. At the start of the trial, the parties agreed that the standard stated in section 1.537-1(b)(2), Income Tax Regs., applies in deciding what is relevant to whether petitioner's accumulation was reasonable.

We next consider whether petitioner had reasonable grounds for its accumulation of earnings in the years in issue.

_____

[15](...continued)
(2) Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year. However, subsequent events may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each year and as they exist as of the close of the taxable year. If a corporation has justified an accumulation for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in determining the reasonableness of subsequent accumulations.

2.   Herd Expansion and Pollution Control

Respondent has the burden of proof on these issues for 1987 and 1988, and to the extent of $550,000 for pollution control for 1989; petitioner has the burden of proof for amounts above $550,000 for 1989.  Gustafson's Dairy, Inc. v. Commissioner, T.C. Memo. 1995-11.

a.   Herd Expansion

Petitioner claims that it needed to accumulate $1,425,000 in fiscal year 1987, $1,575,000 in fiscal year 1988, and $1,575,000 in fiscal year 1989 to replenish and enlarge the dairy herd. Respondent argues that petitioner had no definite plans to enlarge the herd because the CEP contained no projections in category one for herd expansion for the years in issue. Respondent points out that petitioner's herd decreased from 7,585 cows in 1983 to 5,725 cows in 1989.  Respondent argues that the fact that petitioner's herd decreased before and during the years in issue and the fact that petitioner never implemented its plan to enlarge its herd shows that petitioner's accumulation for this purpose was not reasonable.  Respondent contends that petitioner, and not the SCS, chose the 5,500 cow limit.  We disagree.

Petitioner listed in the CEP for fiscal years 1986 through 1989 that it projected to accumulate amounts for herd expansion

in category two and category three, using an assumed market price of $950 in 1987 and $1,050 in 1988 and 1989, and an assumed expansion of 1,500 head. Petitioner planned to enlarge its herd but was forced to postpone its plans because the dike failed in October 1988.

The SCS designed the environmental system to accommodate the largest permissible herd on petitioner's land. The maximum number of cows that petitioner could have on its existing land was 5,500. Thus, the limit on herd size in response to petitioner's animal waste problems does not show that petitioner did not want to increase its herd. Petitioner's accumulation for herd expansion in 1989 was reasonable because petitioner did not know at the end of fiscal year 1989 that it would have to limit the size of its herd.

Petitioner had definite and specific plans to expand its herd in 1987, 1988, and 1989, and reasonably accumulated $1,425,000 in 1987 and $1,575,000 in 1988 and 1989 for this purpose.

### b. Pollution Control

Petitioner contends that it reasonably accumulated $50,000 in fiscal year 1987, $550,000 in fiscal year 1988, and $1,000,000 in fiscal year 1989 for pollution control and improvements to its

environmental system.  Respondent concedes that petitioner reasonably accumulated $21,616 in 1988 and $139,868 in 1989 for pollution control (the lesser of the category one projected expenses in 1988 and 1989 and the actual expenses in the year immediately after the projections).  Respondent argues that petitioner did not anticipate spending large amounts for pollution control in 1989 or accumulate large amounts for this purpose until 1992.

The dike ruptured in October 1988, about 6 months before the end of fiscal year 1989.  Petitioner began to accumulate earnings and profits for pollution control in 1987 because it knew it had problems with its animal waste control system.  Petitioner projected that it needed to accumulate $50,000 in category two to improve its pollution control in fiscal year 1987, $550,000 in fiscal year 1988 ($50,000 in category one and $500,000 in category two), and $1,000,000 in fiscal year 1989 ($500,000 in category one and $500,000 in category two).  Petitioner had projected before the dike broke that it would spend these amounts.  After the dike broke, petitioner projected that it would spend much more to fix its system to comply with DER; but petitioner still underestimated the cost.  Petitioner projected that it would spend more than it actually spent for category one,

and less than it actually spent for category two.  In category one, projected expenses exceeded actual expenses by $28,384 for 1988, and by $360,132 for 1989.  In category two, actual expenses exceeded projected expenses by $101,484 for 1987, by $741,695 for 1988, and by $987,947 for 1989.

We conclude that petitioner reasonably accumulated $50,000 for fiscal year 1987, $550,000 for fiscal year 1988, and $1,000,000 for fiscal year 1989 for pollution control.

3.   Capital Improvements

Petitioner has the burden of proof on this issue. Gustafson's Dairy, Inc. v. Commissioner, supra.

a.   Equipment and Construction

Petitioner accumulated $2,210,000 in fiscal year 1987, $2,105,000 in fiscal year 1988, and $3,900,000 in fiscal year 1989 to buy equipment and vehicles and to make other capital improvements.  Respondent concedes that petitioner reasonably accumulated $560,000 for fiscal year 1987, $1,155,000 for fiscal year 1988, and $400,000 for fiscal year 1989 for those purposes.

Respondent disputes petitioner's claim that it needed to accumulate funds to build more facilities to accommodate its expanded herd.  Respondent points out that petitioner had 7,585 cows in 1983 and contends that petitioner had no need to build

additional facilities if petitioner increased its herd to 7,500 cows. We disagree. The existing facilities (including a milking parlor that could accommodate 10,000 cows) needed to be modernized or replaced, and petitioner planned to expand its herd to 9,000 cows.

Respondent argues that most of the capital assets petitioner bought during the years in issue were items that petitioner bought each year, such as trucks, loaders, and refrigerators, and were not assets bought as part of a capital expansion program. Respondent argues that petitioner incorrectly counted this need for funds both in its working capital calculations and in the capital improvements category. We need not decide whether petitioner included this need for funds both in the capital improvements category and in the working capital category because we have not separately considered petitioner's working capital needs.

Petitioner's category one and two expenses projected for equipment and construction were generally less than its actual expenses for those purposes during those periods. Actual expenses in category one exceeded projected expenses by $305,043 for 1987, $2,335 for 1988, and $447,859 for 1989. In category two, actual expenses exceeded projected expenses by $355,194 for

1987 and $308,299 for 1988. Projected expenses exceeded actual expenses by $1,827,829 for 1989. This confirms that petitioner intended to spend the amounts it accumulated for equipment and construction within the projected time periods. See sec. 1.537-1(b)(2), Income Tax Regs. We hold that petitioner reasonably accumulated $2,210,000 in fiscal year 1987, $2,105,000 in fiscal year 1988, and $3,900,000 in fiscal year 1989 for equipment and construction.

b.     Land Development

Petitioner contends that it needed to accumulate $2,000,000 during the years in issue to buy land.

Respondent argues that petitioner had no plans to move its operations to a less populated area and to develop its land into a planned community during the years in issue, and that it was not reasonable for petitioner to accumulate funds to develop land. Respondent argues that because the dairy is a pre-existing use, Clay County will never force it to relocate. We need not consider this point because petitioner did not accumulate funds to move its operations.

Respondent argues that petitioner bought the Union Camp property in December 1990, after respondent began a tax audit of petitioner in February 1990, to avoid liability for the

accumulated earnings tax. Respondent contends that petitioner's failure to buy land from March 1986 to December 1990 shows that petitioner was not serious about buying land. We disagree. The 1988 CEP projects expenses of $1,500,000 for land. The CEP for 1989 projected expenses of $2,000,000 for land. Petitioner paid about $2,250,000 for the Union Camp property in fiscal year 1991. The fact that petitioner bought the Union Camp property in December 1990 does not show that petitioner was not previously interested in buying land. Sherwood Gustafson learned in 1987 or 1988 that Union Camp might sell some of its land adjoining petitioner's land. Sherwood Gustafson credibly testified that petitioner would have bought the Roberts property if it had not bought the Union Camp property. Petitioner had specific, definite, and feasible plans in fiscal year 1989 to use the $2,000,000 to buy the Union Camp property. We conclude that it was reasonable for petitioner to accumulate $1,500,000 in fiscal year 1988 and $2,000,000 in fiscal year 1989 to buy land.

4.   Debt Retirement

Petitioner has the burden of proof on this issue. Gustafson's Dairy, Inc. v. Commissioner, T.C. Memo. 1995-11.

Petitioner accumulated $3,300,000 in fiscal year 1987 to retire debentures held by Pete Gustafson. Respondent points out

that petitioner's debentures owed to Pete Gustafson did not mature until the earlier of 2014 or when Pete Gustafson died. Respondent argues that petitioner failed to show that it had a definite purpose or plan to accumulate funds to retire debt during the years at issue.

We disagree. Petitioner retired the debt held by Pete Gustafson during fiscal year 1988, paying a total of $3,322,089. Petitioner was obligated to repay the debt when he died. Pete Gustafson was 83 years old and in poor health in 1987. Petitioner reasonably believed that it would have had to retire the debentures long before 2014. Petitioner redeemed the debentures because it wanted to be debt-free. Petitioner paid more than $700,000 in accrued interest on the debentures during fiscal year 1988. Petitioner's tax attorney advised it to redeem the debt because the interest on it was no longer deductible. Redemption of debt is a valid justification for an accumulation. Sec. 1.537-2(b)(3), Income Tax Regs. We do not think the fact that petitioner did not earmark these amounts in the CEP shows that it did not reasonably accumulate amounts for that purpose.

We find that petitioner reasonably accumulated $3,300,000 in 1987 to retire the debt held by Pete Gustafson.

5.  <u>Self-Insurance for Replacement of Herd</u>

Petitioner has the burden of proof on this issue. <u>Gustafson's Dairy, Inc. v. Commissioner</u>, <u>supra</u>.

Petitioner contends that it accumulated $3,300,000 in fiscal year 1987, $3,900,000 in fiscal year 1988, and $3,900,000 in fiscal year 1989 to self-insure against loss of the dairy herd due to diseases or other natural disasters.  This reserve was based on an assumed herd size of 6,000 cows and a replacement cost (net of the estimated slaughter price it would receive) of $550 per cow in fiscal year 1987 and $650 per cow in fiscal years 1988 and 1989.

Petitioner did not have commercial insurance for the risk of loss of the dairy herd.  Few Florida dairies insure their herds because herd insurance is expensive, not because there is no risk of loss.  The fact that most dairies do not buy insurance suggests that it was reasonable for petitioner to not buy insurance.  See sec. 1.537-1(a), Income Tax Regs. (prudent businessperson standard).

Respondent argues that the risks to the herd were too remote to justify maintaining self-insurance.  Respondent points out that, except for the brucellosis outbreak in the 1970's, petitioner's herd has not had significant losses.  Respondent points out that hoof-and-mouth disease was eradicated in the United States in the 1920's, that none of petitioner's cows have had tuberculosis, that petitioner has lost no cattle from natural disasters, and that petitioner's barns built in 1982 can

withstand 100-mph winds. Respondent also points out that petitioner's expert, Richard Moscicki, testified that there was a low probability that petitioner would lose its entire herd due to disease or toxic contamination. Finally, respondent contends that the fact that petitioner waited more than 10 years after the brucellosis outbreak to create the self-insurance reserve shows that petitioner's purpose was to avoid the accumulated earnings tax.

We disagree that petitioner exaggerated the threat of disease or other possible loss to its herd. Petitioner lost about 1,300 cows during the brucellosis outbreak in the 1970's. About 120 of its cows tested positive for brucellosis from 1985 to 1989, and its cows were quarantined during the years in issue. Petitioner's risks increased in the 1980's as more of its cattle were concentrated in smaller areas.

Loss history is relevant if it provides information about the likelihood of the harm. Cf. sec. 1.537-1(f)(2), Income Tax Regs. (referring to product liability loss reserves). However, a taxpayer is not precluded from insuring against a potential loss just because the taxpayer has not previously experienced that particular loss. EMI Corp. v. Commissioner, T.C. Memo. 1985-386.

Respondent contends that petitioner improperly failed to consider that an uninsured loss of cattle could provide tax reductions, or that it may have legal recourse against the supplier of contaminated feed. We disagree. An income tax

deduction would not necessarily provide funds when needed to buy new cattle, and would provide no benefit if petitioner had no income.  If petitioner lost cattle due to contaminated feed, it could take years to recover against the supplier.  We conclude that petitioner's accumulation of funds to self-insure the herd was reasonable.

D.    Conclusion

Petitioner's reasonable business needs exceeded its net liquid assets as shown below:

|  | 1987 | 1988 | 1989 |
|---|---|---|---|
| Herd expansion | $1,425,000 | $1,575,000 | $1,575,000 |
| Pollution control | 50,000 | 550,000 | 1,000,000 |
| Equip./constr. | 2,210,000 | 2,105,000 | 3,900,000 |
| Land | 0 | 1,500,000 | 2,000,000 |
| Debt retirement | 3,300,000 | 0 | 0 |
| Self-insurance (herd) | 3,300,000 | 3,900,000 | 3,900,000 |
| Working capital[16] | 0 | 636,285 | 641,988 |
| Total | $10,285,000 | $10,266,285 | $13,016,988 |
| Net liquid assets: | $9,289,501 | $10,141,109 | $10,835,821 |

Petitioner has also shown that it needed working capital and at least some accumulations for self-insurance for liability; however, in light of the foregoing, we need not separately discuss these points.

---

[16] As conceded by respondent.

We conclude that petitioner did not accumulate earnings and profits beyond its reasonable business needs.  We concluded above that petitioner was not formed or availed of to avoid income tax on its shareholders.  See paragraph II-B-3.  Either conclusion would justify our finding that the accumulated earnings tax does not apply.  See Technalysis Corp. v. Commissioner, 101 T.C. 397 (1993).  Thus, we hold that the accumulated earnings tax does not apply.

E.  Environmental Tax

Respondent determined that petitioner was liable for the environmental tax under section 59A in the amount of $1,177 for the 1988 fiscal year.  Petitioner had the burden of proof, but presented no evidence or argument on this issue.  Respondent states that this issue is computational.  The parties should resolve the amount petitioner owes in the Rule 155 computation.

F.  Negligence

Respondent determined that petitioner is liable for additions to tax for negligence for each of the years in issue. Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985) (citing Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964)).  Under section 6653(a)(1)(A) and (B) for fiscal years 1987 and 1988, and section

6653(a)(1) for fiscal year 1989, the addition to tax applies only if there is an underpayment of tax as defined in section 6653(c).

As discussed above, petitioner is not liable for the accumulated earnings tax. The only possible underpayment relates to the environmental tax under section 59A. Petitioner has presented no evidence or argument as to whether any underpayment of the environmental tax was reasonable. Thus, if the Rule 155 computation shows that petitioner underpaid the environmental tax, all of that underpayment is due to negligence.

To reflect the foregoing and concessions,

Decision will be entered
under Rule 155.